**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**

ADT LLC.,

           Plaintiff,

       v.                         Case No. 9:12-cv-81292

PINNACLE SECURITY, LLC,
PINNACLE SECURITY CA, LP,
DEVCON SECURITY SERVICES CORP.,
and GOLDEN GATE CAPITAL LLC,

           Defendants.

_____

## COMPLAINT

      Plaintiff ADT LLC f/k/a ADT Security Services, Inc. ("ADT"), through its

undersigned attorneys, brings this action against Defendants Pinnacle Security, LLC

("Pinnacle"), Pinnacle Security CA, LP ("Pinnacle CA") (collectively the "Pinnacle Parties"),

Devcon Security Services Corp. ("Devcon"), and Golden Gate Capital LLC ("GGC")

(collectively, "Defendants") and in support thereof avers as follows:

### SUMMARY OF THE CASE

      1.     This is an action for damages, attorneys' fees and injunctive relief arising

from the Defendants' deceptive trade practices.  GGC, through the Pinnacle Parties and Devcon,

is interfering with ADT's contracts with its customers through a pattern and practice of

misrepresentations to ADT's customers regarding ADT's status and ADT's (nonexistent)

affiliation with defendants. These deceptive practices violate Section 43(a) of the Lanham Act,

15 U.S.C. § 1125(a), and the common law of various states.  Moreover, GGC and Devcon

conspired to interfere with a contract between ADT and Pinnacle whereby ADT is protected from further damages arising from Pinnacle's unlawful conduct directed towards ADT customers.  Finally, Pinnacle has also breached said agreement and has refused to pay ADT for the sums owed under it.

## THE PARTIES

2.      Plaintiff ADT LLC is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida  33431.

3.      Defendant Pinnacle Security, LLC is a Limited Liability Company organized under the laws of the State of Utah and with a principal place of business at 1290 Sandhill Road, Orem, Utah  84058.

4.      Defendant Pinnacle Security CA, LP is a Limited Partnership organized under the laws of the State of California with a principal place of business at 1290 Sandhill Road, Orem, Utah  84058.

5.      Defendant Golden Gate Capital LLC is a Limited Liability Company located in San Francisco, California.  Upon information and belief, it is organized under the laws of the State of California.

6.      GGC owns 70% of Pinnacle Security, LLC and Pinnacle Security CA, LP.

7.      Defendant Devcon Security Services Corp. is a corporation organized under the laws of the State of Delaware with a principal place of business at 3880 N. 28th Terrace, Hollywood, Florida  33020.

8.      Devcon Security Services Corp. is wholly owned by GGC.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over ADT's claims that arise under the laws of the United States pursuant to Title 28 U.S.C. § 1331.

10.    This Court has Supplemental Jurisdiction over ADT's claims that arise under state law pursuant to Title 28 U.S.C. § 1367.

11.    Venue in this District is proper pursuant to Title 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this Judicial District.

12.    Defendants are subject to the jurisdiction of this Court as they are citizens of, or regularly transact business in, the State of Florida.

## FACTUAL BACKGROUND

13.    ADT is the largest and best-known provider of electronic security services and equipment in the United States.

14.    ADT provides security services for homes and businesses around the country.

15.    Defendants Devcon and Pinnacle are both competitors of ADT in the residential and commercial security installation and monitoring industry.

16.    GGC is a private equity firm.

17.    On September 30, 2009, GGC acquired 100% ownership of Devcon.

18.    In 2008, prior to its acquisition of Devcon, GGC acquired a controlling interest (approximately 70%) in another home security provider and competitor of ADT, Pinnacle.

19.    Upon information and belief, GGC ultimately controls the operations of both Pinnacle and Devcon.

**PINNACLE'S HISTORY OF DECEPTIVE SALES PRACTICES**

20.    Pinnacle's pattern of unfair and deceptive trade practices is well-known throughout the industry and the law enforcement community.

21.     In addition to lawsuits filed by ADT, other home security providers including, *inter alia*, Monitronics Funding, LP, have instituted legal action based on Pinnacle's unfair and deceptive trade practices and fraudulent acts.

22.     Pinnacle's reputation for fraud and unfair competition is also well-chronicled by the Better Business Bureau.

23.     For example, the Better Business Bureau has assigned Pinnacle an "F" rating on its scale from A+ to F.

24.     The reason for this rating included 1232 Better Business Bureau complaints filed against Pinnacle and Government actions that were filed against Pinnacle.

25.     Of the 1232 Complaints lodged against Pinnacle with the Better Business Bureau, 322 relate to "Sales Practice Issues" and 332 related to "Contract Issues".

26.     Among the 322 Complaints categorized as "Sales Practice Issues" by the Better Business Bureau, 135 are described as "Sales presentation used dishonest sales practices."

27.     Pinnacle's pattern and practice of unlawful sales techniques have also been the subject of multiple lawsuits, investigations, and other disciplinary action instituted by the State Attorneys' General in various jurisdictions.

### *The State Of Illinois's Attorney General Consent Decree*

28.     For example, on October 27, 2009, the State of Illinois filed a Complaint against Pinnacle alleging violation of the Illinois Consumer Fraud and Deceptive Practices Act after its investigation revealed that Pinnacle Security's sales teams have purposely deceived consumers to make a sale.

29.     The Illinois Attorney General Complaint alleged, *inter alia*, that "Illinois consumers report that during several of these solicitations, Pinnacle employees represented expressly, or by implication, that Pinnacle had purchased the consumer's existing home security

-4-

company, or that the consumer's existing home security company was bankrupt and Pinnacle was now servicing their customers."

30.     On March 18, 2010, Pinnacle entered into a Consent Decree with the State of Illinois, which in addition to requiring restitution to the defrauded customers, prohibited Pinnacle from misrepresenting its service terms and its affiliation with a consumer's current security company.

### *Assurance Of Discontinuance With The New York Attorney General Complaint*

31.     Similarly, Pinnacle was the subject of an investigation by the New York Attorney General.

32.     Pursuant to an Assurance of Discontinuance, the New York Attorney General's investigation revealed that:

> Sales Representatives often targeted consumers who were using home security systems provided by Pinnacle's competitors, and made false and misleading representations to induce these consumers to switch home security providers and to execute a new contract with Pinnacle.  The most common false and misleading representations and deceptive practices included:
>
>      a.  falsely claiming that the consumer's existing home security provider was either out of business or were no longer monitoring the consumer's homes;
>
>      b.  falsely reporting that the consumer's existing home security provider had merged with Pinnacle, or that Pinnacle had taken over the home security provider's business, and that the customer needed to execute a new contract with Pinnacle to continue to receive home security services;
>
>      c.  falsely representing or implying that Pinnacle was affiliated with the consumer's existing home security provider, or that the Sales Representative was affiliated or employed by such company;
>
>      d.  conducting phony telephone calls in which Sales Representatives falsely represented that the consumer's existing home security contract had been canceled; [and]

-5-

e.  preparing "cancellation letters" for consumers to send to their existing home security providers.

33.     In addition, the New York Attorney General's investigation centered on Pinnacle's Welcome Call program where each consumer is required to speak by phone with Pinnacle's customer service staff before executing a Pinnacle contract.

34.     The investigation revealed that in several instances, Sales Representatives interfered with Welcome Calls by coaching consumers on how to answer the questions or by impersonating the consumers and completing the Welcome Calls themselves.

35.     As a result of the investigation, Pinnacle agreed to refrain from a panoply of prohibited practices including, *inter alia*, misrepresenting an affiliation between Pinnacle and a consumer's current security provider either directly or by implication.

36.     In addition, Pinnacle agreed to make restitution to the defrauded consumers and pay $150,000 in penalties, costs, and fees to the Office of Attorney General.

37.     Upon information and belief, the respective Attorneys General of other States have investigated and continue to investigate Pinnacle for similar unlawful and deceptive practices.

### *The Ohio Attorney General Complaint*

38.     The Ohio Attorney General's Office filed a Complaint against Pinnacle Security relating to its unsavory business practices.

39.     Specifically, the State of Ohio alleged, *inter alia*, that Pinnacle "made oral representations that they were providing an upgrade to the consumer's current home security system, that they had purchased consumer's current home security contract, that consumer's current home security company was bankrupt or defunct, or that they were otherwise part of/or authorized to continue the monitoring services of the consumer's current home security system."

*Another Consent Decree With The Illinois Attorney General*

40.    Most recently, the Attorney General for the State of Illinois entered into another consent decree with Pinnacle relating to its latest fraudulent and deceptive sales activities.

41.    As alleged in the consent decree, Pinnacle "advertised, solicited for sale, offered to sell, and sold to Illinois consumers, home security products and services through unfair and deceptive acts or practices in the conduct of trade and commerce."

42.    The consent decree further sets forth that Pinnacle "'slammed' consumers by changing their alarm service provider by using fraudulent and deceptive means."

43.    As a result of this latest settlement, Pinnacle agreed to pay a $1 million dollar fine.

44.    In addition to the Attorney General actions listed above, Pinnacle has been sued and/or investigation by the following States:  Florida, Utah, Minnesota, Missouri, Pennsylvania, Wisconsin, and Washington.

**DEVCON, GGC, AND PINNACLE CONSPIRE TO TORTIOUSLY INTERFERE WITH THE ADT-PINNACLE MASTER ACCOUNT PURCHASE AGREEMENT AND FIRST AMENDMENT TO THE MASTER ACCOUNT PURCHASE AGREEMENT**

45.    In or about May 2008, ADT and Pinnacle entered into a Master Account Purchase Agreement ("MAPA") whereby ADT agreed to purchase certain home security customer contracts from Pinnacle.

46.    Because of Pinnacle's well-known history of fraudulent solicitation of existing customers of competitors, including most prominently ADT customers, Pinnacle and ADT agreed to a "bounce" procedure whereby ADT could receive some assurance that any

customer of ADT that Pinnacle managed to convert was not subjected to any deceptive, fraudulent or otherwise unfair trade practices.

47.     Section 6.1 of the MAPA prohibits Pinnacle from, among other things, converting any ADT customers who are within the first term of their ADT contracts.

48.     To ensure compliance with Section 6.1, the MAPA obligates the parties to participate in a procedure designed to prevent Pinnacle from unlawfully diverting ADT customers to Pinnacle.

49.     Under the bounce in the MAPA, Pinnacle must provide a third-party auditor with a list of the customers it obtained during a particular six-month time period.  ADT, in turn, must provide the auditor with a list of its customers who were in the first term of their ADT contracts during that same six-month time period.  If any of the customers on Pinnacle's list match the names on ADT's list and other conditions in the MAPA are not met, Pinnacle must pay ADT liquidated damages.  This is what is known as the Verification Bounce.

50.     On October 19, 2009, ADT and the Pinnacle Parties executed a First Amendment to the Master Account Purchase Agreement ("First Amendment to the MAPA").

51.     Because the First Amendment to the MAPA neither modifies nor extinguishes the Confidentiality Provision found in the MAPA, ADT's description of the Pinnacle Parties' breaches will identify only the respective First Amendment to the MAPA provisions at issue.  As with the MAPA, the Pinnacle Parties possess a copy of the First Amendment to the MAPA and ADT will provide a copy to the Court under seal when necessary.

52.     In addition to the Verification Bounce, Section 6.6 of First Amendment to the MAPA added an additional layer to the bounce process, known as the Preventative Bounce or Pre-Sale Bounce.  The Preventative Bounce provision provides that each time Pinnacle solicits a

potential customer, it must submit the customer's name to a third-party auditor before closing the contract with the potential customer.  The third-party auditor then compares the potential Pinnacle customer's name against a database of ADT customers' names.  If the potential Pinnacle customer's name already appears in ADT's customer database, then the third-party auditor notifies Pinnacle and Pinnacle is not allowed to sign-up the potential customer.

53.     Devcon is not a party to the MAPA or the First Amendment to the MAPA and therefore, its sales activities are not scrutinized under the Preventive and Verification bounce mechanisms contained in these agreements.

**PINNACLE'S BREACH OF THE BOUNCE PROVISIONS
BY FAILING TO PAY DAMAGES FOR 2010 AND 2011**

54.     The Pinnacle Parties breached the Verification and Preventative Bounce provisions by failing to provide the requisite information and evidence that customers taken from ADT in 2010 and 2011 were acquired lawfully and pursuant to Section 6.2 of the First Amendment to the MAPA.

55.     The Pinnacle Parties failed to sign up with a third-party independent auditor or provide data to that auditor for 2010 as required by Section 6.9 of the First Amendment to the MAPA.  ADT was damaged by these actions in an amount to be proven at trial.

56.     For 2011, the Pinnacle Parties failed to transmit contractually agreed upon damages owed for accounts the Pinnacle Parties improperly approved.  For 2011, these damages are equal to at least $240,000 or an amount to be proven at trial, pursuant to Section 6.3 of the First Amendment to the MAPA.

**DEVCON, GGC, AND PINNACLE CONSPIRE
TO OUTSOURCE PINNACLE'S FRAUD**

57.     Upon information and belief, Pinnacle's woeful history of unethical sales practices, multitude of BBB complaints and ratings, and public investigations by State Attorneys' General, caused customers to be dubious of contracting with Pinnacle.

58.     Moreover, the "bounce" procedures required by the MAPA and the First Amendment to the MAPA between ADT and Pinnacle prevented and hindered Pinnacle's ability to convert ADT customers in their initial term without ADT learning of any misrepresentations by Pinnacle during the sales process.

59.     Upon information and belief, in order to evade the MAPA and the First Amendment to the MAPA bounce mechanisms, Pinnacle, Devcon, and GGC entered into an agreement whereby Pinnacle would continue to recruit, contract with, train, and manage its sales force, and the sales force would represent themselves to consumers as "Pinnacle Security, a Preferred Partner of Devcon Security."  The Pinnacle sales force would execute contracts with consumers in which Pinnacle (not Devcon) is the named security service provider, but the Devcon logo would appear on the contract.  Pinnacle installers would then install the security systems.

60.     On November 11, 2011, Pinnacle and Devcon jointly announced that the two entities were entering into a shared services agreement whereby Devcon would provide services to Pinnacle's customers.

61.     Under the shared services agreement, both companies retained their names but Pinnacle's door-to-door sales force were to sell 'Devcon-branded accounts.'  That means that the accounts will be serviced at Devcon's customer care center in Dallas, and Devcon's local branch offices will provide backup service and support to Pinnacle's sales force."

62.     Devcon employees would then service and administer the accounts.

63.     This way, Pinnacle could place these sales on Devcon's books and not have to provide the names of these customers to the third party who administers the bounce mechanisms.  Thus, these sales would escape detection by the bounce mechanisms, and Pinnacle would avoid paying damages to ADT for such accounts.

64.     In the event the ADT customer complained to ADT about the Pinnacle salesman, the customer would describe the salesman as a Devcon employee, as the customer would not know the salesman was truly a Pinnacle employee.  Thus, ADT would not know that Pinnacle had diverted the customer in violation of the MAPA or the First Amendment to the MAPA.

65.     Through this conspiracy, GGC and Devcon tortiously interfered with ADT's rights, and Pinnacle's obligations, under the MAPA and the First Amendment to the MAPA.

66.     Upon information and belief, Pinnacle representatives in fact solicited ADT customers, but identified themselves as Devcon employees and offered Devcon systems.

67.     Many of these Pinnacle representatives succeeded in converting ADT customers to Pinnacle, thereby damaging ADT.

**DEVCON'S UNLAWFUL ACTIVITIES**

68.     Devcon's bad acts did not stop with tortiously interfering with the MAPA and First Amendment to the MAPA between ADT and Pinnacle.

69.     In a calculated and coordinated campaign to circumvent fair competition with unfair practices, Devcon and its agents/employees have engaged in a nationwide campaign of deceiving consumers through myriad of unlawful acts including falsely implying an association and/or affiliation with a consumer's current home security provider.

70.     Devcon's pattern and practice of such improper conduct has caused substantial harm to ADT by stealing its valuable customers and damaging its goodwill and reputation by falsely claiming or implying an affiliation between ADT and Devcon.

71.     As explained at paragraphs 57 to 67 *supra*, Devcon engaged in such conduct pursuant to a conspiracy with Pinnacle and GGC to interfere with the MAPA's and First Amendment to the MAPA's procedure for detecting conversions of ADT customers.

72.     In an attempt to increase its sales numbers, Pinnacle and its agents/employees also embarked on an intentional and relentless false, misleading, and disparaging campaign to steal ADT's customers through additional fraud and harassment.

73.     The following are a few examples of the Deceptive Sales Practices used by Devcon and its employees/agents.

### ADT Customer Dorothy Franzen

74.     On May 3, 2012, three Devcon representatives (two men and a woman) came to the home of an elderly ADT customer named Dorothy Franzen in Portage, Michigan, and <u>falsely</u> told Ms. Franzen that they were from ADT and offered to upgrade her ADT system with new equipment.

75.     Upon information and belief, one of the representatives was Jake Ellsworth.

76.     The Devcon representatives then presented Ms. Franzen with a contract that had the name Devcon on it.

77.     Upon seeing "Devcon" on the document, Ms. Franzen became suspicious and questioned the representatives about the contract.

78.     The representatives <u>falsely</u> stated that Devcon is "part of GE" and also "part of ADT," and that ADT "was part of this contract."

-12-

79.     In reliance on the lies of the Devcon representatives, Ms. Franzen signed the contract.

80.     The three representatives then removed Ms. Franzen's ADT equipment and replaced it with Devcon equipment.

81.     Because the Devcon equipment looked very different from the ADT equipment, Ms. Franzen asked the representatives "Where is my ADT?"

82.     The representatives <u>falsely</u> stated that Ms. Franzen still had her ADT equipment and services.

83.     In furtherance of their deceit, the representatives instructed Ms. Franzen not to remove her ADT yard sign or the ADT stickers on her windows.  This further led Ms. Franzen to believe that she simply purchased an upgrade of her ADT system.

84.     Ms. Franzen then received a letter from ADT expressing concern that ADT would no longer service her.  Ms. Franzen was surprised by the letter because she thought, as the Devcon representatives told her, that she still had ADT services.

85.     Ms. Franzen's daughter contacted ADT and discovered that Ms. Franzen no longer had ADT services.

86.     Upon realizing that the Devcon representatives had deceived her into switching to Devcon, Ms. Franzen contacted the local police and filed a police report.  A police officer came to her home and contacted Devcon.  Devcon informed the policeman that "Jake Ellsworth" was the Devcon representative listed on the paperwork for Ms. Franzen's alarm system.

87.     With the policeman's assistance, Ms. Franzen spoke with a Devcon representative who agreed to cancel her Devcon services and release her from her Devcon contract.

88.     Upon information and belief, Devcon targeted Ms. Franzen because she is a senior citizen.

### ADT Customer Jesse Wright

89.     Devcon's campaign of unlawful activity spread west to California.

90.     At approximately 6:45 p.m. on May 31, 2012, a man who identified himself as "Linden" knocked on the door of Mr. Jesse Wright, a resident of Los Angeles, California, and a satisfied, long time ADT customer.

91.     Linden falsely stated that ADT was "going out of business" and that Mr. Wright's ADT equipment was "old and outdated."

92.     Linden then offered to sell Mr. Wright a security system with Devcon Security.

93.     As a result of Linden's deceptive sales pitch, Mr. Wright signed a contract with Devcon Security for its security services and equipment.

94.     Linden then drafted a letter from Mr. Wright to ADT asking ADT to cancel Mr. Wright's service.  Mr. Wright signed the letter and Linden mailed it.

95.     Linden then left Mr. Wright's home.  Approximately 20 minutes later, a Devcon technician came to Mr. Wright's home, removed the ADT equipment, threw it in the trash, and then installed Devcon equipment.

96.     During the removal and installation process, the Devcon technician punched a hole in one of the walls in Mr. Wright's home and caused additional damage to the home's interior walls.  The technician never offered to repair the damage.

97.     Mr. Wright then received a letter from ADT expressing concern that ADT would no longer monitor his home and enclosing a pamphlet describing various ADT products. Mr. Wright was surprised by the letter because he thought, as Linden <u>falsely</u> told him, that ADT had gone out of business.

98.     After reading the ADT pamphlet and learning that Devcon's and ADT's respective equipment appeared to be the "same thing," Mr. Wright became very upset, as he realized that Linden had lied when he told Mr. Wright that Devcon's equipment was superior.

99.     Mr. Wright then called ADT to report the incident.  He also contacted Devcon to cancel his services and have them remove his Devcon equipment.

### ADT Customer Carla Velez

100.     On or around May 23, 2012, a Devcon salesman named Mark Robinson approached the home of ADT customer Ms. Carla Velez, a resident of Whittier, California.

101.     Mr. Robinson inquired about the ADT signs in Ms. Velez's front yard and her ADT system.

102.     Mr. Robinson said he was with Devcon and <u>falsely</u> stated that Devcon was associated with GE.

103.     Mr. Robinson <u>falsely</u> suggested that ADT was in bankruptcy by stating that GE was concerned with the "ADT bankruptcy."

104.     Mr. Robinson then attempted to scare Ms. Velez into agreeing to a "complimentary upgrade" that he was offering supposedly through GE.

105.     He told Ms. Velez that if her phone line were cut, the land-line would fail and her ADT system would not work.

106.     Next, he stated that GE was providing a "complimentary upgrade" to her alarm system and that her neighbor down the street supposedly signed up for it.

107.    Ms. Velez then asked Mr. Robinson whether his alarm company was affiliated with ADT, he replied <u>falsely</u> that he was with GE, the company that manufactured her ADT system.

108.    Upon further questioning, Mr. Robinson admitted that he was not associated with GE and that he was with an alarm company named Devcon.

109.    When Mr. Robinson claimed that GE was having Devcon representatives switch customers from ADT to Devcon, Ms. Velez asked him to leave.

**ADT Customer Denise Terry**

110.    At approximately 6:00 p.m. on June 12, 2012, a man wearing a jacket with inscriptions "Devcon" and "GE" came to the home of Ms. Denise Terry, a resident of Tacoma, Washington and a long-standing ADT customer.

111.    The man told Ms. Terry that he was affiliated with Pinnacle Security.

112.    The man told Ms. Terry that the "law had changed" and that her ADT alarm system required an upgrade to meet the requirements of the "new law."

113.    And, according to the man, while ADT would charge Ms. Terry $800 to upgrade her ADT system, his company would upgrade the system for free.

114.    The man further stated that Ms. Terry's ADT equipment "belonged" to "GE" and that ADT only "monitored" her home.

115.    This statement is <u>false</u>.

116.    When Ms. Terry informed the man that she was not interested in the upgrade, he became angry and called Ms. Terry "retarded" for not accepting the "free upgrade." The man then stormed away from Ms. Terry's home.

117.    After the man left her home, Ms. Terry telephoned Devcon and described the representative to a female Devcon sales representative who said she would investigate the matter.

118.    The sales representative also informed Ms. Terry that this man might be a Pinnacle representative.

119.    Upon information and belief, in addition to the above-referenced customers there are many additional ADT customers that were victims of the Deceptive Sales Practices used by Devcon and its employees/agents.

**COUNT I**
**(AGAINST ALL DEFENDANTS)**
**UNFAIR COMPETITION IN VIOLATION TITLE 15 U.S.C. §1125(A)**

120.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

121.    Devcon has attempted to sell its goods and services by making false and deceptive representations to ADT's customers.

122.    Devcon's agents/employees have falsely claimed that ADT is going out of business.

123.    Devcon's agents/employees have falsely claimed that ADT is in bankruptcy.

124.    Devcon's agents/employees have falsely claimed that ADT is part of General Electric.

125.    Devcon's agents/employees have falsely claimed that Devcon is associated with General Electric.

126.    Devcon's agents/employees have falsely claimed that General Electric manufactures the components for ADT equipment.

127.    Devcon, by and through its agents/employees, has made each of the deceptive statements with the intent of deceiving consumers as to the relationship, affiliation, or sponsorship between ADT and Devcon.

128.    Devcon's false and misleading statements will create a likelihood of confusion among consumers.

129.    To that end, actual confusion among a significant portion of the consuming public has already occurred.

130.    Moreover, GGC was on notice of Pinnacle and Devcon's pattern of practice of deceptive sales practices by virtue of the (1) prior lawsuits by ADT and other competitors; (2) the complaints received through the BBB; and (3) the numerous lawsuits and investigations by various State Attorneys' General.

131.    Despite this knowledge, GGC permitted Devcon to continue its deceptive sales, and indeed, furthered that activity by granting Devcon access to Pinnacle's sales force and its known history of deceptive and unlawful practices.

132.    ADT has been and will continue to be injured as a result of Devcon's false statements.  ADT's damages include the direct diversion of sales from itself to Devcon, the costs of trying to recoup diverted customers and the loss of goodwill associated with ADT's services.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Defendants and award the following relief:

a.    Enter an Order temporarily, preliminarily, and permanently thereafter restraining and enjoining Defendants, and their respective agents, servants, employees,

officers, attorneys, successors, and assigns, and all persons aiding and abetting, and acting in concert or conspiracy with them, from:

(1)     making any false or misleading statements about ADT concerning any relationship between ADT and a third-party or the status of ADT;

(2)     making any false or misleading statement or a statement that is likely to or intended to confuse an ADT customer or potential customer regarding the function, performance, capabilities, specifications, features, requirements, reliability, availability, origin, sponsorship, approval, or design of any ADT equipment, alarm systems, or services or misrepresent to any ADT customer or potential customer that such customer's security system or ADT's services are deficient in any way;

(3)     making any false or misleading statement or a statement that is likely to or intended to confuse an ADT customer or potential customer into believing that ADT no longer is doing business or has curtailed its services in any manner; and/or

(4)     making any false or misleading statement or a statement that is likely to or intended to confuse an ADT customer or potential customer into believing that ADT was purchased, merged with, associated with, sponsored by, connected to, affiliated with or related to any company, including but not limited to, Pinnacle Security LLC and Devcon.

b.     An accounting for the Profits of Defendant GGC resulting from its conduct and payment of such amount to ADT;

c.     An accounting for the Profits of Defendant Devcon resulting from their conduct and payment of such amount to ADT;

d.     An award of attorneys fees under Title 15 U.S.C. §1117(a); and

e.      Any and all such other and further relief as the Court may deem just and proper.

## COUNT II
## (AGAINST DEVCON SECURITY SERVICES CORP.,
## & GOLDEN GATE CAPITAL, LLC)
## TORTIOUS INTERFERENCE WITH CONTRACT

133.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

134.    The MAPA and the First Amendment to the MAPA between ADT and Pinnacle are business relationships under which ADT has legal rights, including but not limited to, the bounce mechanisms designed to prevent the unlawful conversion of ADT customers.

135.    Devcon and GGC were aware of the MAPA and First Amendment to the MAPA, and more specifically, the bounce mechanisms required under these agreements.

136.    GGC and Devcon tortiously interfered with those relationships by conspiring with Pinnacle and Devcon to have Devcon solicit ADT customers under the "Devcon" name in order to evade the bounce process.

137.    GGC and Devcon's interference was intentional and unjustified.

138.    ADT suffered damage, including the loss of customers and a diminution of goodwill and reputation, as a result of the interference by Devcon and GGC.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and Golden Gate Capital, LLC, and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

## COUNT III
### (AGAINST DEVCON SECURITY SERVICES CORP. & GOLDEN GATE CAPITAL, LLC) CIVIL CONSPIRACY

139.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

140.    Devcon and GGC conspired to interfere with ADT's rights, and Pinnacle's obligations, under the MAPA and the First Amendment to the MAPA.

141.    In or about November 2011, or a date more certain known only to Defendants, GGC and Devcon entered into an agreement whereby they would tortiously interfere with the MAPA and the First Amendment to the MAPA by using Pinnacle sales representatives to solicit ADT customers and sign said customers to "Devcon" contracts.

142.    In furtherance of the aforementioned conspiracy, GGC and Devcon directed Pinnacle to enter into a shared services agreement in order to permit Pinnacle sales representatives to sell on behalf of Devcon, instead of Pinnacle.

143.    GGC and Devcon did have Pinnacle sales representatives sign ADT customers to "Devcon" contracts.

144.    As a result of these acts performed pursuant to the conspiracy, ADT suffered damages including lost customers.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and Golden Gate Capital, LLC, and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

**COUNT IV**
**(AGAINST DEFENDANT DEVCON SECURITY SERVICES CORP.)**
<u>**UNFAIR COMPETITION IN VIOLATION OF THE COMMON LAW**</u>

145.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

146.    Devcon is a direct competitor of ADT, as it sells similar security services as ADT.

147.    Pinnacle's and Devcon's conduct is unlawful in that, among other things, it violates the Minnesota, California, Michigan Unfair Competition Laws as well as the Unfair Competition Common Law of all States in which Pinnacle and Devcon conduct business.

148.    Devcon's conduct, and that of its agents/employees, constitutes unfair, unlawful, and fraudulent business practices that constitute unfair competition.

149.    Devcon's conduct is fraudulent in that, among other things, Devcon has misrepresented, *inter alia*, that ADT no longer is in business and/or that it is affiliated with Devcon.

150.    Devcon knew that these statements were false and were made by Devcon's agents/employees with intent to create confusion in the minds of ADT customers that ADT services were now being offered by Devcon.

151.    Devcon's false statements have caused some consumers to break their contracts with ADT thereby decreasing ADT's profits.

152.    By its actions, Devcon has misappropriated the labors and expenditures of ADT.

153.    Devcon reasonably should recognize that its false statements about ADT would adversely impact ADT's sales and cause damage to ADT and its reputation.

154.    ADT has suffered harm as a result of Devcon's conduct.

-22-

155.    Devcon's conduct is intolerable and violates accepted standards of commercial morality.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

**COUNT V**
**(AGAINST DEVCON SECURITY SERVICES CORP.)**
**BUSINESS DEFAMATION AND/OR TRADE LIBEL**

156.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

157.    Devcon's sales activities contain statements about the integrity of ADT's business that are false.

158.    These false and misleading statements are material and tend to induce ADT customers to stop using ADT's services.

159.    Devcon's false statements have imputed want of integrity to ADT in its business.

160.    Devcon's false and misleading statements have caused and will cause ADT to lose sales and good will and suffer damages.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

**COUNT VI**
**(AGAINST DEVCON SECURITY SERVICES CORP.)**
**BUSINESS DISPARAGEMENT**

161.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

162.    Devcon's sales activities contain statements about ADT services that are false.

163.    Devcon's false and misleading statements demean the quality of ADT's goods.

164.    These false and misleading statements are material and tend to induce ADT customers to stop using its services.

165.    Devcon's false and misleading statements have caused and will cause ADT to lose sales and good will and suffer damages.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

**COUNT VII**
**(AGAINST  DEVCON SECURITY SERVICES CORP.)**
**TORTIOUS INTERFERENCE WITH CONTRACTS**

166.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

167.    A valid contract existed between ADT and each of its customers, including Ms. Franzen and Mr. Wright.

168.    Devcon knew about the contracts between ADT and its customers.

169.    Devcon intentionally procured the breach of these contracts.

170.    Devcon's encroachment into ADT's contracts with its customers was done without justification or legal privilege.

171.    ADT suffered harm as a result.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Devcon Security Services Corp. and award compensatory and punitive damages, and any and all such other and further relief as the Court may deem just and proper.

## COUNT VIII
### (AGAINST PINNACLE SECURITY, LLC
### & PINNACLE SECURITY CA, LP)
### <u>BREACH OF CONTRACT</u>

172.    ADT incorporates by reference the allegations contained in Paragraphs 1 through 119 as if set forth fully herein.

173.    The MAPA and the First Amendment to the MAPA constitute valid and enforceable contracts.

174.    ADT has fulfilled and continues to fulfill all of its obligations pursuant to the MAPA and the First Amendment to the MAPA.

175.    Pinnacle has breached and otherwise failed to fulfill its obligations under the MAPA  and First Amendment to the MAPA, respectively.

176.    ADT is entitled to its reasonable attorney's fees and costs pursuant to Section 9.12 of the MAPA.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against Pinnacle Security, LLC, and Pinnacle Security CA, LP, and award compensatory damages in an amount to be proven at trial, attorney's fees pursuant to Section 9.12 of the MAPA, and any and all such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

ADT demands a jury trial of all issues triable to a jury.

Dated:  December 2, 2012

Respectfully submitted,

s/C. Sanders McNew

_____

C. Sanders McNew, Esq.
mcnew@mcnew.net
Florida Bar No. 0090561
McNEW P.A.
2385 NW Executive Center Drive
Suite 100
Boca Raton, Florida  33431
Tel:  (561) 299-0257
Fax:  (561) 299-3705

Robert L. Hickok, Esq.*
Angelo A. Stio III, Esq.*
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, Pennsylvania 19103
Tel:  (215) 981-4000
Fax:  (215) 981-4750
hickokr@pepperlaw.com
stioa@pepperlaw.com

*Attorneys for the Plaintiff, ADT LLC*

*\*Pro Hac Vice Applications to be Filed*